IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

HEATHER D. ZANONI,         )      Case No.  08 C 50274
                            )
         Plaintiff,    )
    vs.                 )      Magistrate Judge
                            )      P. Michael Mahoney
MICHAEL J. ASTRUE,       )
Commissioner of Social Security, )
                            )
         Defendant.   )

## MEMORANDUM OPINION AND ORDER

### I.     Introduction

Heather Zanoni seeks judicial review of the Social Security Administration

Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act.  *See* 42 U.S.C. § 405(g).  This matter is before the

magistrate judge pursuant to the consent of both parties, filed on March 10, 2009.  *See* 28 U.S.C.

§ 636(c); Fed. R. Civ. P. 73.

### II.    Administrative Proceedings

Claimant first filed for DIB on or about September 3, 2004 and amended her application

on September 17, 2004.  (Tr 107, 109–14.)  She alleges a disability onset date of May 1, 2004.

(Tr. 114, 540.)  Her claim was denied initially and on reconsideration.  (Tr. 497, 503.)  The

Administrative Law Judge ("ALJ") conducted hearings into Claimant's application for benefits

on June 9, 2006, and March 15, 2007 (Tr. 511, 534.)  At the first hearing, Claimant was not

represented by counsel, and the ALJ continued the hearing to allow her to obtain counsel and to

request medical documents. (Tr. 513–525, 528.) At the second hearing, Claimant was represented by counsel and testified. (Tr. 536–81.) Dr. Daniel Schiff, a psychiatrist, Susan Entenberg, a Vocational Expert, and Rexanne Zanoni, Claimant's mother, were all present and testified. (Tr. 564–81.) The ALJ issued a written decision denying Claimant's application on August 8, 2007, finding that Claimant could perform the requirements of her past relevant work as a lay up specialist. (Tr. 20–29.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 9–11.)

## III. Background

According to testimony, Claimant was born on September 6, 1980, making her 26 years old at the time of her hearing. (Tr. 542.) She has two children and lived with her boyfriend at the time of her hearing. (Tr. 541.) She completed high school and took some college courses in 2005. (Tr. 542.)

Claimant testified that she experiences pain in her back, legs, hips, knees, and her right arm and hand. (Tr. 549.) She described a constant sharp pain in her lower back that has become worse over a period of years. (Tr. 549–50.) She alleged that the pain in her back radiates to her arms and legs on a nightly basis and on occasion when she walks around during the day. (Tr. 551.) She also described her emotional state as being very depressed on a daily basis, which caused her to dislike being around others. (Tr. 550–51.) Claimant can stand for twenty to thirty minutes comfortably, can walk for about half of a block before stopping to sit, and can sit in one position for about thirty minutes before her back begins to hurt worse. (Tr. 556.) Her mother works as her Personal Care Attendant for several hours a day and takes care of tasks around her

house.  (Tr. 557.)

Claimant stopped working on or around July 1, 2004.  (Tr. 164, 544.)  From 1995 to 2004, Claimant worked at approximately thirty-eight different positions according to her Earnings Report.  (Tr. 123–128.)  The majority of the positions appear to be temporary telemarketing positions that she worked at between 1997 and June 2001, and again sporadically between 2002 and 2004.  (Tr. 129–134, 215.)  These positions typically involved sitting for seven hours per day, writing, typing, and handling small objects for approximately four hours.  (Tr. 218, 546–47.)  From June 2001 to March 2002 she worked as a waitress.  (Tr. 215.)  Claimant testified that in 2002 she worked at a nursing home, which required her to sit for about four hours, be on her feet for about four hours, and to perform typing, filing, and cash register duties.  (Tr. 545–46.)  From January 2004 to April 2004, Claimant worked as a lay-up specialist, which required sitting at a table and cutting photos for yearbooks.  (Tr. 215.) From June 2004 to July 2004 Claimant worked as a packager, which required her to stand and place bolts and screws into boxes.  (Tr. 544.)    This job also required lifting large boxes of fifty pounds or more.  (Tr. 545.)  Claimant stated that she stopped working after the packaging job because her back became too painful.  (Tr. 545.)

In 2005, Claimant began attending college classes to become a paralegal.  (Tr. 542–44.)  She testified that she attended classes for about three months and then switched to home schooling because she could not handle sitting for long periods of time or being around a lot of people.  (Tr. 543.)  She proceeded with home schooling for three or four months and then stopped because of post partum depression and the teacher moving out of the state.  (Tr. 543–44.)

Since she stopped working or taking classes, Claimant described her typical day as including taking her daughter to pre-school, sometimes interacting with her kids, occasionally performing some household chores, and watching television from bed.  (Tr. 557–559.)  She sometimes changes her son's diaper, and is able to lift him but not comfortably.  (Tr. 558–59.)  Her mother comes to her house every evening to help with household tasks such as cooking, cleaning, and bathing her children.  (Tr. 557.)  Her mother also helps Claimant get into the shower and get dressed because she has trouble bending over.  (Tr. 560–61.)  Her mother does her grocery shopping and runs other errands for her.  (Tr. 557.)  She is able to see other family members two or three times a week, goes out to breakfast once a week, and occasionally goes on brief shopping trips.  (Tr. 555.)  Claimant also testified that she has trouble sleeping for more than a few hours because of the discomfort, and sleeping medications do not seem to work.  (561–62.)

Claimant's mother also testified at the hearing on March 15, 2007.  (Tr. 536.)  She stated that she lived with her daughter up until six months prior to the hearing.  (Tr. 577.)  She is now paid by the State of Illinois to be her daughter's Personal Care Attendant.  (Tr. 578.)  She helps with Claimant's children, runs errands for her, does her laundry, and helps her get dressed.  (Tr. 578.)  She felt that Claimant's pain had gotten worse over the last few years, and stated that her crying increased in frequency.  (Tr. 579.)

IV.    **Medical Evidence**

According to a summary prepared by Dr. R.F. Neiman on August 8, 2001, Claimant's relevant medical history begins on August 16, 1999, when she injured her back while attempting to lift a patient at a nursing home where she was working.  (Tr. 237.)  She reported a sharp pain

in her back and received a course of physical therapy.  (Tr. 237.)  She experienced continued

problems with her lower back and was seen by Dr. Caratta, a chiropractor who treated her with

electrical therapy, heat, and alignments.  (Tr. 237.)  She was then seen by Dr. Morris Mark

Soriano, who ordered an MRI scan of her back that was performed on January 23, 2001.  (Tr.

237, 407–08.)  The MRI report noted that Claimant had a tiny central disk protrusion at L3–4

and degenerative changes at L5–S1, but no significant lateralizing nerve root pressure at either

location and no other evidence of focal disc herniation or spinal stenoses.  (Tr. 408.)  Dr. Soriano

did not believe that the neck and lower back pain reported by Claimant was caused by the disc

protrusion or that the protrusions were caused by Claimant's injury.  (Tr. 407.)  Dr. Neiman

reviewed Dr. Soriano's findings and felt there was evidence of disc herniation that was causing

Claimant's symptoms.  (Tr. 238.)  Using The American Medical Association Guides to

Permanent Impairment, Dr. Neiman found Claimant's level of impairment to be 7% of the whole

person.  (Tr. 238.)  Dr. Neiman noted that Claimant will have difficulty with tasks which require

repetitive flexion, extension, and lateral flexion of the lumbrosacral spine.  (Tr. 238.)  He

believed she could lift ten to fifteen pounds repetitively and up to thirty pounds maximum.  (Tr.

238.) While Dr. Neiman found Claimant could not return to her previous job as a certified nurse,

he stated that she was certainly capable of other employment.  (Tr. 238.)

Dr. Soriano ordered Claimant to undergo physical therapy.  (Tr. 409.)  In a letter dated

April 11, 2001, Rockford Health Systems sent Dr. Soriano a letter indicating that Claimant did

not make contact or show up for her physical therapy appointments and was discharged from

physical therapy and biofeedback training.  (Tr. 409.)

Beginning on October 18, 2002, Claimant was treated by Dr. Harry W. Darland.  (Tr.

437.)  Dr. Darland prescribed Vicodin for Claimant's back pain and noted that he may order a

CT scan.  (Tr. 437.)  Dr. Darland ordered Claimant to undergo a CT scan on February 5, 2003,

which revealed mild degenerative changes of the lower lumbar from L3 to S1 with evidence of

mild disc protrusion at each level, but no frank herniation or significant foraminal conflict.  (Tr.

448.)  At a follow-up visit to the CT scan on March 7, 2003, Claimant reported good days and

bad days with her back and Dr. Darland reported discussing a plan for improvement.  (Tr. 435.)

In a letter dated March 19, 2003, Dr. David Park wrote to Dr. Darland that Claimant was a good

candidate for bariatric surgery.  (Tr. 438.)

In addition to the follow-up from the CT scan, Claimant had approximately fifteen

follow-up visits with Dr. Darland between November 25, 2002 and November 19, 2004.  (Tr.

427–37.)  During the follow-up visits, Claimant presented with various ailments, including back

pain, diet and weight issues, diarrhea, a finger injury, a runny nose, fatigue, foot pain, sinus

pressure and cold symptoms, an earache, depression, chest pain and a cough, and a cold.  (Tr.

427–37.)  Back pain or a note about a lower back disorder regularly appears in Dr. Darland's

notes, along with prescriptions for Vicodin, Topamax[1], Klonopin[2], Zoloft, and Adipex.  (Tr.

427–37.)  In the same time period, Claimant was listed as a "no show" five times and cancelled

an additional appointment.  (Tr. 427–37.)

------

[1]Topamax is a seizure and migraine medication.  Some of the most common side effects
include tingling of the arms and legs, nausea, and nervousness.  The FDA recommends
contacting a healthcare provider immediately if a patient experiences new or worsening
depression, new or worsening anxiety, panic attacks, insomnia, or unusual changes in behavior
or mood.  U.S. Food and Drug Administration, *Medication Guide Topamax (topiramate)*,
http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152837.pdf (last visited Aug. 30, 2010).

[2]Klonopin (clonazepam) is used in treatment of seizure disorders and to treat panic
disorder, as defined in DSM-IV.  *Physician's Desk Reference* 2855 (64th Ed. 2010).

On November 19, 2004, the same day Dr. Darland's notes reflect a visit with Claimant regarding cold symptoms, notes from Dr. Phillip Higgins' office state that Claimant called stating that she had been vomiting all day and was advised to take Azithromycin with food. (Tr. 320, 427.) Around this same time, Claimant had begun seeing Dr. Higgins in addition to Dr. Darland. (Tr. 318-21.)

On December 2, 2004 Claimant saw Dr. Badruddoja regarding back and neck pain. Dr. Badruddoja noted that Claimant had been seeing a doctor in Rockford for three years who was prescribing her Vicodin for pain. (Tr. 270.) Her pain was not constant, but would go through periods of remission and recurrence. (Tr. 270.) When the pain recurs, Claimant stated that the pain can be as high as 8/10 on a scale of 1 to 10. (Tr. 270.) There was no radiation of pain, numbness, tingling sensation, or weakness. (Tr. 270.) Claimant recently had a sudden onset of cervical pain with minimum radiation to other areas. (Tr. 270.) Dr. Badruddoja noted that there was tenderness in the lumbar area, and that the bilateral straight leg test was negative, but otherwise all neurological examinations and flexion motions were normal. (Tr. 270.) Similar findings were made for the cervical area. (Tr. 270.) The doctor's impressions were that claimant had a chronic lumbar sprain and acute cervicalgia, but ruled out lumbar disk syndrome and cervical disk syndrome. (Tr. 270.) He prescribed a chiropractic evaluation and a physical therapy evaluation. (Tr. 271.)

On December 6, 2004, Claimant underwent a physical therapy evaluation at the Rehabilitation Associates of Northern Illinois. (Tr. 268.) Claimant reported that she was only able to sleep five or six hours per night due to the pain, and that physical therapy helped to decrease the constant pain. (Tr. 268.) The assessment found that Claimant had cervical and

lumbar pain of mild severity and found that she was a good candidate for physical therapy.  (Tr. 269.)  It was suggested that Claimant undergo physical therapy two to three times a week for four weeks, including therapeutic exercises and electrical stimulation.  (Tr. 269.)  A chart in Claimant's medical record indicates that she attended physical therapy on December 14, 2004, but contains no notes from any other session.  (Tr. 274.)

On December 20, 2004, Claimant was examined by Dr. Stephen Geller for a report to the State of Illinois Bureau of Disability Determination Services.  (Tr. 277.)  Dr. Geller noted that Claimant indicated a steady, constant pain in her low back with occasional sharp spasms.  (Tr. 277.)  Claimant indicated that the pain was worse on the left than the right and radiated to both hips and down the mid-thighs, and sometimes around the front of the lower abdomen or down to her feet.  (Tr. 277.)  She also had occasional neck pain, and recently noticed numbness in her hands occurring mostly at night.  (Tr. 277.)  Claimant's physical examination revealed that she had no joint abnormalities and full ranges of motion except for the straight leg raise, standing forward flexion to ninety degrees, and lateral bending to twenty degrees. (Tr. 278.)  Dr. Geller noted that due to back pain, Claimant can walk only 10–15 minutes before resting for 10 minutes; can climb 5-6 stairs and stand for 30-60 minutes, can sit for 30 minutes, and can lie down for 2 hours.  (Tr. 277.)  Claimant had prescriptions for Vicodin for pain, Topamax for migraines, clonazepam for panic attacks, and Adipex for weight loss.  (Tr. 278.)  She was capable of all activities of daily living "except occasionally needing help dressing her feet."  (Tr. 277.)  Dr. Geller found that Claimant had mechanical low back pain, degenerative arthritis of the spine, and morbid obesity.  (Tr. 279.)

At the December 20, 2004 appointment, Dr. Geller also evaluated Claimant's

psychological health.  (Tr. 278.)  She indicated the development of anxiety and serious

depression in seventh grade stemming from a dysfunctional home.  (Tr. 278.)  Dr. Geller found

Claimant was able to relay her history with a normal affect, and found no other signs of

depression.  (Tr. 278–79.)  He diagnosed her with controlled anxious depression.  (Tr. 279.)

On January 13, 2005, Dr. Victoria Dow, a state agency physician, assessed Claimant's

residual functioning capacity based on her medical records.  (Tr. 280.)  She found that Claimant

could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for about 6 hours

in an 8-hour day, sit with normal breaks for about 6 hours in an 8-hour workday, and was

unlimited in her push and/or pull capacity.  (Tr. 281.)  Other than listing that Claimant could

never balance, Dr. Victoria noted no other limitations.  (Tr. 282–85.)

Claimant learned she was pregnant on or around January 3, 2005, and proceeded to have

numerous medical appointments and communications with Dr. Higgins and other health care

providers at Rockford Health Systems throughout the pregnancy.  (Tr. 323–373.)  On March 9,

2005, Claimant contacted Dr. Higgins' office seeking a note as an excuse for school because of

nausea, cold symptoms, and pregnancy.  (Tr. 343.)  Claimant states that she saw her family

practice physician for bronchitis on March 7, 2005, though Dr. Darland's notes from March 7,

2005 do not appear to list bronchitis.  (Tr. 343, 426.)  On April 8, 2005, Dr. Higgins' office notes

that Claimant was seen in the ER for a fall.  A visit with Dr. Higgins later that same afternoon

reflects that Claimant had trouble differentiating between her old back pain and the pain she was

currently feeling, but noted that she had taken multiple medications for lower back and

abdominal discomfort prior to her pregnancy.  (Tr. 346–47.)  On April 19, 2005, Dr. Darland's

office learned that Claimant was pregnant and called Claimant's pharmacy to cancel her Vicodin

prescription.  (Tr. 425.)  Dr. Darland's office learned that Claimant had picked up her Vicodin

prescription six days prior, and called to instruct her not to take it.  (Tr. 425.)

On May 19, 2005, Dr. Darland's notes reflect that he filled out Claimant's Social

Security Disability information.  (Tr. 425.)  On August 12, 2005, Dr. Darland noted that

Claimant was in severe pain and could not sleep.  (Tr. 424.)  On October 14, 2005, Dr. Darland

met with Claimant and his notes mention a CT scan that confirms disc herniation, though it is

unclear what CT scan he refers to.  (Tr. 423.)  On March 28, 2006, Dr. Darland's office noted

that Claimant's back was stable with no change, and that diet, exercise, and physical therapy

would help.  (Tr. 420.)  On May 23, 2006, Claimant spoke to Dr. Darland regarding her social

security hearing, and specifically, explaining her problems with her back and why she could not

sit long enough to do a telemarketing job.  (Tr. 420.)

On June 7, 2006, Dr. Darland composed a general "To Whom it May Concern" letter

stating that Claimant was unable to sit for longer than 1/2-hour at any given time without getting

up and walking around or lying down for about 20-30 minutes.  (Tr. 411.)  The letter also stated

that, at times, getting up or lying down will not even work, "and after one or two times of sitting

for 1/2-hour intervals, the pain may become too intense to site any longer and work at even

telemarketing."  (Tr. 411.)

On June 26, 2006, Dr. Darland filled out a form entitled "Medical Source Statement of

Ability To Do Work-Related Activities (Mental)" indicating that Ms. Zanoni did not have any

mental limitations (Tr. 413–15.). On the same date, Dr. Darland filled out a similar form as to

Claimant's physical limitations.  (Tr. 416.)  He indicated that Claimant could lift/carry less than

ten pounds occasionally; stand or walk less than two hours in an eight hour day; needed to

alternate sitting and standing to relieve pain or discomfort; and was limited in pushing/pulling capabilities in her lower extremities. (Tr. 416–17.) Dr. Darland listed findings of a herniated disc in the lumbar spine and low back disorder to support his findings. (Tr. 417.) Dr. Darland opined that Claimant could occasionally climb ramps/stairs/ladder/rope/scaffold and kneel, and could never balance, crouch, crawl, and stoop due to low back disorder radiating into the lower extremities. (Tr. 417.) Dr. Darland listed Claimant as being occasionally limited in reaching, but having no other manipulative impairments. (Tr. 418.) He did not set out any environmental limitations. (Tr. 419.)

On July 21, 2006, Claimant met with Dr. Mark B. Langgut, Ph.D., for a psychological assessment. (Tr. 454.) Dr. Langgut noted Claimant's personal and family histories with depression, including Claimant's past psychiatric hospitalizations and ongoing post partum depression. (Tr. 454–55.) Claimant told Dr. Langgut of family problems, legal problems including an arrest for unauthorized use of a stolen credit card, a fabricated report of domestic abuse against her boyfriend, her estrangement from her children, and her poor work history. (Tr. 454–55.) Dr. Langgut administered the Wechsler Adult Intelligence Scale-III, and found that Claimant had an I.Q. score of 88, adequate intellectual skills, and suffers from emotional difficulties that include depression, impulsivity, emotional immaturity, and compulsive eating. (Tr. 457.) His listed diagnostic considerations included attention deficit hyperactivity disorder, inattentive type, major depressive disorder, moderate without psychotic features/eating disorder, and personality disorder with borderline features. (Tr. 457.)

Dr. Langgut also filled out an Ability to do Work-Related Activities (Mental) form, indicating that Claimant would have slight problems understanding, remembering, and carrying

out detailed instructions and moderate problems making judgments on simple work-related decisions. (Tr. 458.) Dr. Langgut indicated that Claimant would have slight impairment responding appropriately to others. (Tr. 459.) He indicated that there were no other capabilities affected by her mental impairment. (Tr. 459.)

On August 29, 2006, Claimant again visited Dr. Darland. (Tr. 469.) He noted that her back was the same and made a note about working on SSDI. (Tr. 469.) Claimant did not show up to her next appointment with Dr. Darland on September 29, 2006. (Tr. 483.) On October 10, 2006, Claimant underwent an MRI on her lumbar spine that revealed no disc degeneration at T12-L1 through L2-3 and some indications of early disc degeneration at L3-L4, L4-L5, and L5-S1. (Tr. 487.) The exam was negative for disc bulging or herniation. (Tr. 487.) On November 6, 2006, Dr. Darland filled out a form for the State of Illinois Department of Rehabilitation Services and stated that Claimant was appropriate for the Home Services Program. (Tr. 484.) Dr. Darland identified osteoarthritis in the lumbar spine coupled with severe obesity as Claimant's medical impairments. (Tr. 484.) He noted that Claimant would be unable to walk great distances, bend, twist, or lift loads greater than 10 pounds. (Tr. 486.)

On November 7, 2006, Claimant saw James P. Elmes, M.D. for an orthopedic consultative examination for the Bureau of Disability Determination Services. (Tr. 470.) Claimant reported back pain as her top ailment, rating its intensity as a 5 out of 10 that could go as low as a 3 but as high as a 10. (Tr. 470–71.) She rated her reported hand and wrist pain as a 0 out of 10 that could range as high as 5 out of 10. (Tr. 471.) Both ailments were made worse by weather changes, lifting, and direct pressure. (Tr. 471.) Dr. Elmes noted midline tenderness in Claimant's lower back and decreased range of motion. (Tr. 473.) Claimant's number one

problem was listed as non-specific low back pain, followed by degenerative disc disease, facet degenerative joint disease, non-specific bilateral knee pain, non-specific bilateral wrist and hand pain, exogenous obesity, restless leg syndrome, and depressive disorder. (Tr. 474.) Dr. Elmes opined that Claimant could occasionally and frequently lift less than 10 pounds, could stand and/or walk less than 2 hours, must periodically alternate sitting and standing to relieve pain or discomfort, that pushing and/or pulling was limited, that she could occasionally climb ramps and stairs, balance, and stoop, but could never climb ladders, ropes, and scaffolds, kneel, crouch, or crawl. (Tr. 475-77.)

Dr. Daniel Schiff, a medical expert ("ME") and psychiatrist, testified at Claimant's hearing regarding her mental impairment. (Tr. 567.) The ME noted that the record was sparse regarding the mental issue, but opined that Claimant's testimony indicated she had some degree of depression. (Tr. 567.) The ME mentioned that Claimant was on five medications that could have sedative effects, and noted that they could cause some strange side effects or overstimulation. (Tr. 569.) Overall, the ME concluded that Claimant's mental diagnoses were not adequately supported based on the record. (Tr. 569.)

## V. Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.     Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

14

whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.    Analysis**

    **A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Claimant "has not engaged in substantial gainful activity since May 1, 2004, the alleged onset date of disability." (Tr. 22.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

    **B.    Step Two: Does the Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: degenerative disc disease of the lumbar spine, obesity, and depression. (Tr. 22.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

C.     **Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. The ALJ found that Claimant's back impairment did not meet or medically equal Listing 1.04A, the listing for disorders of the spine,

because it is not accompanied by neurological deficits and the record does not contain other findings of equivalent severity. (Tr. 22.) The ALJ's determination is supported by substantial evidence in the record, and neither party challenges this finding.

Regarding Claimant's depression, the ALJ found that she has no more than a mild limitation in her activities of daily living and concentration, persistence, and pace; moderate limitations in social functioning; and no episodes of decompensation of extended duration. (Tr. 22–23.) In order to find the required level of severity under Listing 12.04, the listing for affective disorders such as depression, either the requirements in subparts A and B, or the requirements in subpart C must be satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.04. The ALJ's finding, supported by substantial evidence in the record, clearly explains why Claimant's symptoms do not meet the requirements in Listings 12.04B or 12.04C. Therefore, the ALJ's determination was appropriate as to Claimant's depression and neither party challenges this finding.

The ALJ found that, because there is no listing for obesity, the Claimant's condition can only be found to meet or equal the requirements of a listing if she has another impairment that, by itself, meets the requirements of a listing, or if she has an impairment that, in combination with obesity, meets the requirements of a listing. There is no substantial evidence in Claimant's medical record to suggest that the additional or cumulative effects of obesity would cause Claimant's other impairments to meet the requirements of a listing-level impairment, 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 1.00(Q), and neither party challenges this finding.

The court affirms the ALJ's Step Three determination.

**D.     Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

17

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. *Id.* Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R.

§ 404.1565(a); Soc. Sec. Rul. 82-62. If the claimant's RFC allows him to return to past relevant

work, the claimant will not be found disabled; if the claimant is not able to return to past relevant

work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the
following:

> "The claimant has the residual functioning capacity to perform
> work activities except for lifting/carrying less than 10 pounds
> occasionally; pushing/pulling no more than 6 pounds; standing
> and/or walking less than 2 hours in an 8 hour day; can sit for 6
> hours out of an 8 hour day if permitted to change position every 30
> to 45 minutes; no climbing, kneeling, crouching or crawling;
> balancing and stooping no more than occasionally; and no work
> with the public or as a member of a team or where she is closely
> supervised." (Tr. 23.)

In making her RFC determination, the ALJ considered the combination of Claimant's

impairments. (Tr. 23.) After noting the substantial evidence in Claimant's medical record, the

ALJ found that Claimant's medical impairments could reasonably be expected to produce the

alleged symptoms. (Tr. 28.) The ALJ then had to consider the intensity, persistence, and

limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's

ability to do basic work activities. Where statements about the intensity, persistence, or

functionally limiting effects of pain or other symptoms are not substantiated by medical

evidence, a finding is made on the credibility of the statements based on a consideration of the

entire record. The ALJ found Claimant's statements to be not entirely credible, noting that

Claimant's allegedly limited daily activities cannot be objectively verified with any reasonable

degree of certainty and, if they are as limited as she alleged, it is difficult to attribute that degree

of limitation to Claimant's medical conditions in view of the relatively weak medical evidence.

(Tr. 28.)

The ALJ's RFC determination tracked closely that of the consultative examiner, Dr. Elmes. (Tr. 28.) The ALJ noted that she added a few more limitations to address Claimant's mental health issues. (Tr. 28.) The ALJ's RFC determination also reflects many of the opinions from Claimant's treating physician, Dr. Darland.

The ALJ evidenced detailed consideration and understanding of the record in her summary of hearing testimony and Claimant's medical history and built a logical bridge to her conclusion. (Tr. 24–28.) The substantial evidence in the record supports the ALJ's RFC determination and the ALJ's decision on Claimant's credibility. It also supports the ALJ's decision to give weight to Dr. Elmes' medical opinion where it differed from Dr. Darland's June 7, 2006 letter. The court specifically notes the following:

- MRI scans in 2001 and 2006, and a 2003 CT scan did not find any evidence of disc herniation, foraminal conflict, or stenosis. They revealed only tiny or mild disc protrusions in the lumbar area of Claimant's back and mild or early disc degeneration in the L3-L4, L4-L5, and L5-S1 areas.

- Claimant's diagnoses inconsistently ranged from mechanical low back pain to facet degenerative disc disease to osteoarthritis to chronic lumbar sprain to low back disorder.

- Three different treating physicians prescribed relatively conservative treatment plans of physical therapy and/or chiropractic evaluation, diet, and exercise for Claimant, though the record does not indicate whether any physical therapy treatment cycle was completed.

- Claimant presented before treating physicians Dr. Darland and Dr. Higgins with myriad symptoms and ailments over dozens of appointments, and wrist and hand pain scarcely appear among the notes in the record.

- Medical opinions or diagnoses regarding the intensity of Claimant's alleged symptoms or limitations appear no more frequent or severe after her alleged onset date than prior to it.

- After her alleged onset date, and less than three months prior to Dr. Darland filling out Claimant's Social Security paperwork, Claimant indicated to Dr.

Higgins that she was still attending college classes.

- Claimant was pregnant when Dr. Darland initially filled out Claimant's Social Security paperwork, and when he noted her most severe pain. Claimant had previously indicated to Dr. Higgins that she had trouble differentiating between back pain during her pregnancy and her previous back pain.

- There are no findings in Claimant's medical records of serious depression symptoms, and no treating or evaluating physician found anything other than mild limitations based on her mental impairment.

The court also notes that on May 23, 2006, Claimant spoke with Dr. Darland about an upcoming Social Security hearing, and specifically, about explaining why Claimant would be unable to sit long enough to do a telemarketing job. (Tr. 420.) Approximately two weeks later, Dr. Darland wrote a letter indicating that Claimant's pain may become too severe to work after one or two times of sitting for half-hour intervals, and specifically mentioned that she may not be able to do telemarketing. (Tr. 411.) The ALJ noted that there was nothing in the treatment notes to reflect the level of restriction listed in Dr. Darland's letter "other than Claimant's desire to present such a limitation in support of her disability claim." (Tr. 26.)

Notwithstanding the letter composed at Claimant's request, Dr. Darland filled out an ability to do work-related activities form pursuant to the ALJ's request that indicated fewer limitations than his letter suggested. Dr. Darland opined that Claimant was unlimited in the manipulative function of fingering and in pushing and/or pulling with upper extremities. (Tr. 417–18.) Dr. Darland did not note any limits in the length of time Claimant could sit during an 8-hour work day, indicating only that she must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 418.) In fact, while Dr. Darland and Dr. Elmes expressed substantially similar opinions in their respective ability to do work-related activities forms, Dr. Darland actually noted less restrictive limitations than Dr. Elmes in several areas.

Further, the ALJ's evaluation that Claimant's statements and described daily activities were not entirely credible was articulated through a comparison of those statements to the medical evidence in the record. As noted above, the evidence in the record supports the ALJ's RFC determination. The medical record does not indicate any period of increased intensity of symptoms or physiological changes that would support Claimant's testimony that she has essentially gone from full-time work or taking classes to being fairly limited in her daily activities. The ALJ correctly notes that Claimant has received relatively conservative treatment and has never been referred to an orthopedic or mental health specialist by her treating physician. An ALJ's determination of credibility should not be overturned by a reviewing court unless it is "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Here, the ALJ noted specific evidentiary factors from the medical record that did not support Claimant's description of her daily activities.

The ALJ found that Claimant was capable of performing her past relevant work as a lay-up specialist based on VE's testimony. The VE testified that someone with Claimant's RFC was capable of performing the work as a lay-up specialist. The ALJ clearly relied on Claimant's description of the job as she performed it, as this information was elicited from Claimant during the VE's testimony. This finding is consistent with the ALJ's RFC determination. Claimant argues her RFC limitation on working with the public, as a member of a team, or with close supervision precludes work as a lay-up specialist. There is a difference, however, between working at a table where others are also working and being a member of a team or working closely with a supervisor. The court is not persuaded that this limitation was overlooked by the ALJ.

Claimant also argues that the VE provided confusing testimony while stating that there were additional sit/stand sedentary options in the national economy. Specifically, after stating that Claimant could perform her past work as a lay-up specialist the VE testified that there would be approximately 8,000 sedentary jobs with a sit/stand option in the Chicago region. The latter part of the VE's testimony would relate to Step Five, not Step Four. There does not appear to be any confusion with the VE's testimony as it relates to the ALJ's Step Four decision.

The ALJ considered the substantial evidence in the record to make credibility determinations as to Claimant's testimony and the opinions of her treating and evaluating physicians. The ALJ drew a logical bridge from the supporting evidence to her RFC determination and reasonably relied on the relevant portions of the VE's testimony to make her Step Four finding. Therefore, the court affirms the ALJ's decision as to Step Four.

## VIII. Conclusion

For the forgoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.

**E N T E R:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**DATE**: September 7, 2010